DSS:CMP/HLJ
F.#2013R00444

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**13 M 294**

- - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

ALBERTO LAJUD,

        Defendant.

- - - - - - - - - - - - - - - - - - -X

<u>SEALED COMPLAINT AND
AFFIDAVIT IN SUPPORT
OF ARREST WARRANT</u>

(18 U.S.C. § 1029)

EASTERN DISTRICT OF NEW YORK, SS:

      CHRISTIAN WILSON, being duly sworn, deposes and states that he is a Special Agent with the United States Secret Service, duly appointed according to law and acting as such.

      Upon information and belief, in or about and between September 2012 and March 2013, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ALBERTO LAJUD, together with others, did knowingly and with intent to defraud conspire to effect transactions with one or more access devices issued to another person or persons, to wit: debit cards used to withdraw funds from automated teller machines, to receive payment and other things of value during a one-year period, the aggregate value of which was equal to or greater than $1,000, in a manner affecting

interstate commerce, contrary to Title 18, United States Code, Section 1029(a)(5).

(Title 18, United States Code, Section 1029(b)(2)).

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I am a Special Agent with the United States Secret Service ("USSS"). I have been employed by the USSS for approximately five years. I am responsible for conducting and assisting in investigations into the illegal use of computers and computer networks by individuals and criminal groups. These investigations are conducted in both an undercover and overt capacity. This assignment requires extensive training in the investigative techniques associated with computer investigations and knowledge of legitimate computer applications. I have participated in investigations involving search warrants and arrest warrants. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities. I am also familiar with the tools and materials used by individuals

---

[1] Because this affidavit is submitted for the limited purpose of establishing probable cause, I have not set forth each and every fact learned during the course of the investigation.

2

carrying out their attacks against computer systems or using computers to facilitate their illegal acts.

2. I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from: (a) my personal participation in this investigation, (b) reports made to me by other law enforcement authorities, (c) information obtained from confidential sources of information, and (d) interviews with witnesses and victims.

## BACKGROUND OF THE INVESTIGATION

3. The USSS is currently investigating an ongoing international conspiracy to hack into the computer systems of financial institutions and other businesses in the United States and abroad for the purpose of stealing confidential financial account information, including account numbers and personal identification numbers ("PINs"). The hackers in turn sell this information to individuals in the United States and other countries over the Internet. The hackers and their associates generally transmit this information through an array of online communication mechanisms, such as email and instant messaging. Ultimately, the purchasers of the stolen financial information use the account numbers to encode plastic cards, such as gift cards and hotel card keys, which they then use to withdraw

3

currency from automated teller machines ("ATMs") located at banks in the United States and elsewhere in a scheme known as a "PIN cashout," "PIN cashing" or "carding."

       4.    Based on my experience investigating this and similar carding schemes, I am aware that the participants in such schemes operate in a fluid organizational structure. According to information I have learned through searching email accounts, computers, servers and other forms of electronic evidence, monitoring consensually-recorded communications, and debriefing cooperating witnesses at every level of this informal structure, among other sources, I am aware that the hackers and their financial backers are generally responsible for targeting the victim financial institution, planning the intrusion and executing the attack. These individuals often rely upon a trusted group of business associates to disseminate the stolen financial information globally to managers around the world. These managers generally run local "cashing" crews of individuals (known as "cashers" or "cashiers") who actually conduct the fraudulent transactions via ATM withdrawals and fraudulent purchases. The majority of the proceeds of PIN cashout operations flow up from the cashers to their managers and then to the higher levels of the operation; the cashers often transfer the funds via international wire transfer

4

services as Western Union and MoneyGram, among other methods. In sophisticated cashout operations, the hackers and their closest business associates may access the victim network during and even after the attack in order to monitor the fraudulent financial transactions and to ensure that they are not being cheated by the cashers and managers.

5. In or about December 2012, an Indian credit card processor that handles Visa and MasterCard prepaid debit cards was the victim of an extensive network intrusion. As a result of this intrusion, the hackers were able to increase the withdrawal limits on prepaid MasterCard debit card accounts associated with the Bank Identification Number ("BIN") 529549. The BIN identifies the issuing financial institution, which in this case was RAKBank, located in the United Arab Emirates. This type of scheme is known in the PIN cashout and carding community as an "unlimited operation." In such operations, hackers in the past have successfully manipulated account balances and in some cases security protocols to effectively eliminate any withdrawal limits on individual accounts. As a result, even a few compromised bank account numbers can result in tremendous financial loss to the victim financial institution. Based on my experience investigating this and similar operations, I am aware that successful unlimited

5

shift

shift

Case 1:13-cr-00259-KAM   Document 1   Filed 03/29/13   Page 6 of 13 PageID #: 31

operations are rare events requiring a high degree of technical proficiency, coordination and patience on the part of criminal actors.

A. The RAKBank Unlimited Operation

6. Between approximately December 21, 2012 and December 22, 2012, five account numbers for the compromised RAKBank accounts with increased balances were distributed to individuals located in approximately 20 countries around the world, including numerous transactions conducted in Brooklyn, Queens and Long Island, among other United States locations. The individuals receiving these card numbers encoded the data onto magnetic stripe cards, such as gift cards and hotel key cards, and used those cards to withdraw funds from ATMs in their respective locations. In total, more than 5,700 ATM transactions were attempted using the compromised RAKBank account data, resulting in a total loss of approximately $5 million.

B. The Bank of Muscat Unlimited Operation

7. In or about February 2013, a credit card processor based in the United States that handles Visa and MasterCard prepaid debit cards was the victim of an extensive network intrusion that resulted in yet another unlimited

6

operation, in which the hackers increased the withdrawal limits on MasterCard prepaid debit card accounts. In this instance the compromised accounts included multiple BINs, such as 530553, 530555, 530551, 511318 and others, which identified Bank of Muscat, located in Oman, as the issuing financial institution for the compromised accounts.

8. Between approximately February 19, 2013 and February 20, 2013, 12 account numbers for the compromised Bank of Muscat accounts with increased balances were distributed to individuals located in approximately 24 countries across the globe, including numerous transactions conducted in Brooklyn, among other United States locations. The total loss resulting from the Bank of Muscat unlimited operation was approximately $40 million.

## PROBABLE CAUSE

9. In the days following the RAKBank unlimited operation, the USSS obtained surveillance images from various financial institutions and other entities that owned or operated many of the ATMs used to make the fraudulent withdrawals. Surveillance images show the defendant ALBERTO LAJUD conducting fraudulent transactions during the RAKBank unlimited operation on December 22, 2012. I have compared the male described in the following surveillance images to the photograph of LAJUD from

7

his New York State Driver's License and found them to be the same person:

- Surveillance images from December 22, 2012 show LAJUD making three withdrawals totaling approximately $1209 using the same compromised RAKBank account number in a one minute time period (between 17:16 and 17:17) during the RAKBank unlimited operation at an HSBC location at 739 Amsterdam Avenue, New York, New York 10025.

- Surveillance images from December 22, 2012 show LAJUD making four withdrawals totaling approximately $3212 using the same compromised RAKBank account number in a three minute time period (between 17:27 and 17:30) during the RAKBank unlimited operation at a Bank of America location at 808 Columbus Avenue, New York, New York, 10025.

10. The compromised RAKBank account number that LAJUD used on December 22, 2012 was used by co-conspirators to conduct approximately 705 successful ATM withdrawals totaling approximately $382,597 in and around New York City. Globally, the same compromised RAKBank account number was used to conduct approximately 1,084 fraudulent withdrawals for a total loss of approximately $628,985.

11. In the days following the Bank of Muscat unlimited operation on approximately February 19, 2013 and February 20, 2013, the USSS obtained surveillance images from the various financial institutions and other entities around the world that owned or operated ATMs used to make fraudulent withdrawals with the same various compromised Bank of Muscat

8

account numbers. Surveillance images indicate that at least four of LAJUD's co-conspirators who were identified in ATM surveillance footage making fraudulent withdrawals during the RAKBank unlimited operation (using the same compromised RAKBank account number as LAJUD) also made fraudulent withdrawals in and around New York City using the same compromised Bank of Muscat account number.

12. Based on my experience investigating these and similar unlimited operations, I am aware that the leaders of these criminal operations generally distribute only a single compromised account number to a particular "crew" so that the leaders of the operation can monitor the total fraudulent withdrawals for any given account number in order to make sure that they are not being cheated out of their share. Thus, I believe that LAJUD is part of the same conspiracy that resulted in both the RAKBank and Bank of Muscat unlimited operations. The compromised account number used by LAJUD's coconspirators during the Bank of Muscat unlimited operation resulted in approximately 2,904 successful ATM withdrawals in the immediate vicinity of New York with a total loss of approximately $2.4 million. Globally, this compromised Bank of Muscat account number was used to conduct approximately 11,778 fraudulent withdrawals for a total loss of approximately $8.9 million.

Coconspirator communications obtained by the USSS indicate that the withdrawal limit for this particular compromised Bank of Muscat account had been increased to $40 million as a result of the network intrusion.

13. In addition to the bank records, surveillance images and other evidence described above, in the course of investigating this access device fraud conspiracy, the government also executed multiple search warrants for email accounts associated with LAJUD. On March 4, 2013, United States Magistrate Judge James Orenstein authorized the issuance of a search warrant for the email accounts "marcostaveraz@yahoo.com" (the "Marcos Account") and "joeironjoe@yahoo.com" (the "IronJoe Account") based upon evidence indicating that the accounts were used in furtherance of the access device fraud conspiracy, including the above-described unlimited operations. Execution of these search warrants provided evidence that the Marcos and IronJoe Accounts are used by LAJUD as well as by at least one other co-conspirator.

14. Multiple email messages found in the IronJoe Account discussed various types of financial account fraud and computer intrusions:

- On or about December 28, 2012, an email was sent from the IronJoe Account to "support@wmirk.ru" with the following details in the body of the message:

       Sender: [Name of CC#1]
       City: New York
       State: New York
       Country: USA
       Receiver: Roman ivanovich kruchinin
       MTCN: 895-862-8712
       Amount: 950
       LR Account: U7093888

Based on my experience in this and other carding investigations, I am aware that the email address "support@wmirk.ru" is associated with an organization based in St. Petersburg, Russia that specializes in laundering the proceeds of criminal activity. As a result, I believe that this email indicates that the user of the IronJoe Account had CC#1 send a wire transfer via Western Union ("MTCN" refers to "Money Transfer Control Number," a numeric wire transfer identification system used by Western Union) to fund an account at Liberty Reserve ("LR"), an electronic currency service frequently used to transfer criminal proceeds in carding activities.

- On or about January 09, 2013, an email message was sent from the email account albertolajud@hotmail.com to the IronJoe Account with no subject. The body of the message contained only the text, "Sent from my iPhone." The message contained a single attachment entitled, "photo.JPG." A review of the attached photo indicates that the image shows an individual in a vehicle with three deposit slips from Bank of America on their lap. A review of the information on the deposit slips shows the following transactions:
    - $5000 deposit on January 09, 2013 at 14:34 to an account ending in 7824;
    - $1500 deposit on January 09, 2013 at 14:35 to an account ending in 7824; and
    - $5000 deposit on January 09, 2013 at 14:31 to an account ending in 6539.

Later on January 09, 2013, an email message was sent from IronJoe Account to the email account help@entelnova.com. In the body of the email message the sender indicates, "I sent scanned deposit slips

11

via whatsapp."2  On January 10, 2013, an email message was sent from the email account help@entelnova.com to the IronJoe Account.  In the message the sender indicates, "Deposit has cleared. Order paid.  Good Job.  We can supply you 10k more for Bank of America.  If you can move to stay in California, it is better because can take more to CitiBank.  We can not take deposit to Citibank outside California as Bank ask many questions if it is deposited out of state."  The sender additionally includes information indicating that representatives have funded $15,178.54 to the Liberty Reserve Account U9808524 in the name of AL Tech Solutions.  Based on my training and experience in this investigation, I believe that the user of the IronJoe Account directed cash deposits into the specified Bank of America accounts run by collusive e-currency provider Entelnova in an effort to launder the proceeds of the cashout activity conducted in relation with the RAKBank unlimited operation.

- On or about September 18, 2012 an email was sent to the Marcos Account confirming a purchase of software used to unlock iPhones.  The billing information listed for the purchase was: Alberto Lajud 38 Stratton St. Yonkers, New York 10701.  This is the same address that is listed on LAJUD's New York State Driver's License.  The contact phone number for the purchase is listed as 917-741-9604, which is a phone number that was listed as a contact in the phone of one of LAHUD's co-conspirators who has been arrested in connection with this investigation.

WHEREFORE, your affiant respectfully requests that an arrest warrant be issued for ALBERTO LAJUD, so that he may be dealt with according to law.

Furthermore, in light of the defendant ALBERTO LAJUD's sophistication with computers and the Internet, your affiant

---

2   "WhatsApp" is a cross-platform smartphone messenger that allows users to send instant text messages to one another.  Such messages are not subject to interception by law enforcement.

12

respectfully requests that this affidavit, arrest warrant and any other papers submitted in support of this application be sealed until further order of the Court so as to prevent notifying the defendant of the pending warrant, which could result in his destruction of evidence and/or alteration of travel plans to avoid arrest.

CHRISTIAN A. WILSON
Special Agent
United States Secret Service

Sworn to before me this
29th day of March, 2013

THE HONORABLE VIKTOR V. POHORELSKY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK